AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

ALL RECORDS RELATING TO THE E-MAIL
ADDRESS
CIRRUSELECTRONICS@GAMIL.COM
LOCATED AT THE OFFICES OF GOOGLE,
1600 AMPHITHEATRE PARKWAY,
MOUNTAIN VIEW, CALIFORNIA

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:

(Further described below)

I _____James D. Walker_____ being duly sworn depose and say:

I am a(n)___Special Agent with the Federal Bureau of Investigation_____ and have reason to believe
(Official Title)
that ☐ on the person of or ☒ on the property or premises known as   (name, description and or location)
Computer systems of Google, located at 1600 Amphitheatre Parkway, Mountain View, California.

(describe the person or property to be searched)
in the Northern District of California, there is now concealed certain property, the disclosure of which is governed by
Title 50, United States Code, Section 1705, Title 22, United States Code, Section 2778, and Title 18, United States
Code, Sections 371 and 951(a), namely contents of electronic data more fully described in Attachment A to the
Affidavit in support of this Application (which is hereby incorporated by reference)

which are (state one or more bases for search and seizure set forth under Rule 41(c) of the Federal Rules of Criminal Procedure)
evidence, fruits, and instrumentalities of communications concerning the unlawful exports of restricted U.S. origin
commodities to Government of India entities in India and concerning the activities in the United states of illegal
agents of the Government of India. In violation of Title 50 U.S.C. §1705, Title 22 U.S.C. §2778, and Title 18 U.S.C.
§§371 and 951 (a).   The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED
HEREIN

Continued on the attached sheet and made a part hereof.      ☒  YES    ☐  NO

Jay I. Bratt, AUSA

_____
Signature of Affiant
(202) 353-3602

Sworn to before me, and subscribed in my presence

_____
Date

National Security Section
_____
James D. Walker,  Special Agent
Federal Bureau of Investigation

at Washington, D.C.

_____        _____
Name and Title of Judicial Officer                 Signature of Judicial Officer

_____ AFFIDAVIT FOR SEARCH WARRANT

I, James D. Walker, hereafter referred to as Affiant, being duly sworn, hereby depose and

state as follows:

**E-MAIL ACCOUNT TO BE SEARCHED**

1.      This affidavit is being submitted in support of an application for a search warrant

for a certain email account controlled by the web-based electronic mail provider known as

Google, located at 1600 Amphitheatre Parkway, Mountain View, California.  The account to be

searched is cirruselectronics@gmail.com, as further described in Attachment A.  Based on the

investigation conducted, there is probable cause to believe that evidence, as described in

Attachment A of this affidavit, currently exists on the computer systems of Google, and is

evidence of violations of:

18 U.S.C § 371 (Conspiracy)

50 U.S.C. §§ 1701-1706 (International Emergency Economic Powers Act -
"IEEPA");

15 C.F.R Parts 730-774 (Export Administration Regulations - "EAR");

22 U.S.C. § 2778 (Arms Export Control Act - "AECA");

22 C.F.R. §§ 120-130 (International Traffic in Arms Regulations - "ITAR"); and

18 U.S.C. § 951(a) (Illegal Agent of a Foreign Government).

**AFFIANT'S BACKGROUND**

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been

employed by the FBI since September 2005.  In the course of my duties, I am responsible for

investigating the illegal transfer from the United States of commodities, information, and

1

services that are regulated by the U.S. Departments of State and Commerce.

3.      Prior to my appointment with the FBI, I was a commissioned officer in the U.S. Army for approximately five years. During that time, I was an executive officer for a tank company and was responsible for managing logistical operations for a combat brigade serving in Iraq.

4.      The information set forth in this affidavit is based on Affiant's personal knowledge of the investigation and information received from vendor companies, other FBI Special Agents, public record sources, surveillance, and other sources as indicated herein.  In addition, I have received information from other federal law enforcement officials and have reviewed documents obtained during the course of the investigation.  This affidavit does not set forth all information known to the FBI about this case and is being submitted solely for the purpose of providing sufficient information to establish probable cause for the search of the addresses below.  Unless otherwise indicated, all written and oral statements referred to herein are set forth in substance and in part, rather than verbatim.

## SUMMARY OF PROBABLE CAUSE

5.      I submit that the facts set forth in this affidavit establish:

a.      There is probable cause to believe that PARTHASARATHY SUDARSHAN ("SUDARSHAN"), MYTILI GOPAL ("GOPAL"), AKN PRASAD ("PRASAD"), and SAMPATH SUNDAR ("SUNDAR"), doing business as Cirrus Electronics ("Cirrus"), have conspired to violate and have violated IEEPA and AECA by exporting restricted U.S. origin commodities with ballistic missile and

2

conventional military applications to the Government of India without first obtaining the necessary export licenses.  There is also probable cause to believe that, in making these unlawful exports, SUDARSHAN and GOPAL have acted in consultation with and under the direction of officials of the Government of India, in violation of 18 U.S.C. § 951(a).

b.      There is further probable cause to believe that presently located in the email account of cirruselectronics@gmail.com, there are evidence and instrumentalities of the foregoing violations, to wit, the items listed in Attachment A.

## RELEVANT EXPORT LAWS AND REGULATIONS

### A.      International Emergency Economic Powers Act (IEEPA)

6.      The United States Department of Commerce is responsible for reviewing and controlling the export of certain goods and technologies from the United States to foreign countries.  The Export Administration Act ("EAA"), 50 U.S.C. App. §§ 2101-2420, authorized the Department of Commerce to prohibit or curtail the export of any goods and technology as necessary, to protect, among other things, the national security and foreign policy of the United States.  The Department of Commerce implemented that authority through the Export Administration Regulations ("EAR"), 15 C.F.R. Parts 730-774.  Although the EAA lapsed in August of 2001, the EAR continues to be in effect under the provisions of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, by virtue of Executive Order 13222 (August 17, 2001), as extended by successive Presidential notices.  IEEPA requires that all criminal violations of its restrictions be willful.

3

7.    The Department of Commerce authorizes the exportation of goods and technology to restricted countries and foreign end-users through the issuance of a license.  Any export of goods from the United States to a restricted country or foreign end-user without such a license is a violation of the EAR.

8.    Supplement No. 4 to Part 744 of the EAR contains a list (hereinafter the "Entity List") that includes certain Indian government, quasi-governmental, and private entities that the Department of Commerce has determined to be involved in nuclear or missile activities.   These activities pose a risk to the foreign policy and national security of the United States because of their significance for nuclear explosive purposes and for the delivery of nuclear devices. Pursuant to the EAR, the Department of Commerce ordinarily requires individuals and companies seeking to export goods from the United States to consignees on the Entity List first to obtain a license from the Department of Commerce.

9.    In 1998, after India conducted tests of its nuclear capabilities, the United States imposed sanctions against the nation.  In order to implement the sanctions, the Department of Commerce placed a number of state sponsored enterprises on the Entity List in the EAR.  In general, if an organization is on the Entity List, it is unlawful to export U.S. origin commodities to that organization unless the Department of Commerce has granted licenses for the exports.

10.    Among the various Indian state enterprises on the Entity List are the Vikram Sarabhai Space Centre ("VSSC") and Bharat Dynamics Ltd. ("BDL").  VSSC is within the Government of India's Department of Space.  It is responsible for developing rockets and space launch vehicles.  Some of VSSC's activities relate to India's civilian space and satellite

programs; however, VSSC is also involved in the development of ballistic missiles.  BDL is

within the Government of India's Ministry of Defense.  Unlike VSSC, BDL's activities relate

solely to the development of ballistic missiles.  It does not produce rockets for use in the civilian

space program.

11.    In September 2004, the Department of Commerce eased the sanctions as to VSSC

and permitted the export of non-restricted goods – which are known under the regulations as

EAR 99 commodities – and a small category of controlled commodities to VSSC without a

license, so long as the items would not be used in a restricted end-use such as in a missile or

nuclear weapon.  As described more fully below, all of the goods that Cirrus exported to VSSC

required a license, both before and after the easing of the sanctions.  Moreover, members of

Cirrus, including SUDARSHAN, GOPAL, PRASAD, and SUNDAR, knew that these

commodities needed a license for export to VSSC.

12.    The Department of Commerce requires a license for the export of all U.S. origin

commodities to BDL.  It has never eased the sanctions as to this entity.

####    B.    The Arms Export Control Act (AECA)

13.    The export of certain items and services, known as defense articles and services,

is governed by the Arms Export Control Act ("AECA"), 22 U.S.C. § 2778, and the International

Traffic in Arms Regulations ("ITAR"), 22 C.F.R. Parts 120-130.  These items or services are set

forth in and constitute the United States Munitions List ("Munitions List") codified at 22 C.F.R.

§ 121.1.  Pursuant to Section 2778(b)(2) of the AECA, no defense article and services designated

by the President of the United States under the statute and regulations cited above can be

exported without a license issued in accordance with AECA and the ITAR. The United States

Department of State, Directorate of Defense Trade Controls ("DDTC"), has responsibility for

issuing licenses for the export of defense items and services. In addition, exporters in the United

States of defense items and services are required to register with the DDTC. AECA requires that

all criminal violations of its restrictions be willful.

14.     Aside from its nuclear arsenal, India has, in recent years, emphasized developing a

domestic industry for conventional weapons. Among other projects, the Ministry of Defence,

through the Aeronautical Development Establishment ("ADE"), has sought to manufacture

fighter jets. One such aircraft is the Tejas Light Combat Aircraft. In acquiring sophisticated

parts and technology for the Tejas, an obstacle that ADE has encountered is the restrictions that

the United States places on the export of defense articles under AECA and the ITAR. The

DDTC gives special scrutiny to exports of such items to India. Thus, ADE has faced delays in

acquiring key components for the Tejas, as well as the denial of licenses.

          **C.     Illegal Agent of a Foreign Power**

15.     Title 18 U.S.C. § 951(a) (Illegal Agent of a Foreign Power) requires individuals,

other than a diplomatic or consular officer or attache, who act under the direction or control of a

foreign government, to notify the Attorney General.

**EVIDENCE SUPPORTING PROBABLE CAUSE**

          **A.     Cirrus Electronics' Business Operations**

16.     Cirrus was founded by SUDARSHAN in 1997 in Singapore, where it conducts

business as Cirrus Electronics Pte Ltd. ("Cirrus Singapore") at Level 3, ECON Building, No. 2,

Ang Mo Kio Street 64, Ang Mo Kio Industrial Park 3, Singapore.  Cirrus' internet site,

www.cirruselectronics.com, contains photographs of rocket launchers and combat aircraft.  The

internet site states that "Cirrus not only specializes in sourcing MIL [military] components that

are marked discontinued by the original manufacturer but also acts as one stop vendors for all

generic and military grade electronic and electro mechanical components from world wide

sources."

     17.    SUDARSHAN formerly worked as an engineer for a Indian defense manufacturer

named Hindustan Aeronautics Limited ("HAL").  In this capacity, SUDARSHAN became

familiar with a variety of defense related products, including combat aircraft.  SUDARSHAN's

knowledge of Indian defense entities, combined with his training and experience in military

electronics, has made Cirrus successful at identifying and procuring electronic components for its

customers.  Cirrus has many competitors vying to supply its customers; successfully winning

business requires an ability to execute orders more quickly than their competitors.  Applying for

export licenses can significantly delay the time it takes to fulfil an order.  To date, Cirrus has

never applied for an export license with the Department of Commerce or with the DDTC.

     18.    As Cirrus' business grew, SUDARSHAN found it necessary to establish an office

in the United States.  GOPAL, who had moved to South Carolina, incorporated Cirrus

Electronics LLC ("Cirrus U.S.A.") in the State of South Carolina on November, 19, 2003.  The

incorporation papers list Cirrus U.S.A.'s address as 22 Redglobe Court, Simpsonville, South

Carolina, which is GOPAL's address.

     19.    Sometime in or around August 2004, Cirrus formally opened a branch in

Bangalore, India.  PRASAD is CEO of Cirrus India.  In India, Cirrus conducts business as Cirrus

Electronics Marketing (P) Ltd. ("Cirrus India"), with an office at #303, Suraj Ganga Arcade,

332/7, 15th Cross 2nd Block, Jayanagar, Bangalore, India.

20.    In December 2004, SUDARSHAN moved from Singapore with his wife,

VAIDEKI SUDARSHAN ("VAIDEKI") to the United States and lived initially with GOPAL at

22 Redglobe Court in Simpsonville, South Carolina.  In August, 2005, SUDARSHAN purchased

a residence and moved nearby to 201 Huddersfield Drive, Simpsonville, South Carolina.  In

addition to serving as offices for Cirrus U.S.A., 22 Redglobe Court and 201 Huddersfield Drive

are also the permanent residences for GOPAL and SUDARSHAN, respectively.  In order to

efficiently coordinate Cirrus' global business operations, SUDARSHAN established a email

account with Google, cirruselectronics@gmail.com, on February 9, 2005.  Comminations

regarding Cirrus business activity were saved to this email account.  As such, the account was a

means for Cirrus to preserve pertinent communications, both internal corporate information and

external client related information.

21.    After SUDARSHAN left Singapore, SUNDAR assumed responsibility for Cirrus

Singapore.  SUNDAR holds the title of Director of Operations.  He also, at times, works from

Cirrus' India offices.

22.    I have learned that it is common for individuals seeking to evade U.S. export

controls to divert restricted commodities through countries to which exports of the items do not

require licenses.  Once the goods arrive in such destinations, they are immediately re-exported to

the restricted nations and end-users.  The investigation of Cirrus has revealed that Cirrus uses its

Singapore office as a transshipment point for its illegal exports to India. Because none of the items that Cirrus has been acquiring in the United States needs a license for export to Singapore, shipments to that country will not raise suspicions among U.S. Customs and Border Protection inspectors reviewing outgoing packages. In order further to conceal from the U.S. government that goods are going to restricted entities in India, Cirrus has vendors send items to its South Carolina addresses, thereby making the sales appear to be domestic transactions. After the goods arrive in South Carolina, GOPAL ships them to Singapore, from where they are to be re-exported to the restricted end-users in India.

### B.    Evidence of Willful Violations of IEEPA and the EAR

#### 1. Unlawful Exports of SRAMs Vikram Sarabhai Space Centre ("VSSC")

23.    In the fall of 2002, SUDARSHAN and SUNDAR contacted a Phoenix, Arizona, vendor about purchasing a variety of models of the company's components. Among the products that the company sold were Static Random Access Memory (SRAM) chips. These particular SRAMs were designed to withstand extreme changes in temperature and had applications in missile guidance systems. The company's International Sales Manager responded to SUDARSHAN's and SUNDAR's inquiry with an e-mail on October 9, 2002, in which he stated:

> P. SUDARSHAN,
>
> I received your quote request today. I have told you in the past I cannot and will not ever give pricing and availability without knowing who the end user is and what country they are located in. [My company] is the manufacturer of these parts and there are several laws that we must follow regarding military product. I will not quote without knowing these answers from the beginning.

24.    On December 2, 2002, SUNDAR sent an e-mail to the Phoenix vendor's sales

representative requesting a price quotation for 10 model WS512K32N-17H1QA SRAMs.  The representative again demanded an end-user statement, and, on May 7, 2003, SUNDAR finally provided the vendor with an end-user certificate that purported to be from the "Naval Physical & Oceanographic Laboratory" ("NPOL") in Kochi, India, and that claimed that the SRAMs were "to be used for the development of electronic hardware for oceanographic instrument measuring the ocean parameters for our own use."  The end-user statement was purportedly signed by a Mr. T. Sreeprakash.  After receiving the statement, the vendor shipped the SRAMs to Cirrus Singapore on May 23, 2003.  Records from Cirrus that the FBI has obtained during the investigation show that the real customer for the product was VSSC and that Cirrus Singapore re-exported the SRAMs to VSSC upon their arrival in Singapore.  Because Cirrus concealed from the vendor that VSCC was the true consignee of the goods, the vendor never obtained a license for the export.

   25. In August 2003, SUDARSHAN and SUNDAR contacted the Phoenix vendor's sales representative about purchasing a different model of SRAM.  On this occasion, they disclosed that VSSC would be the end-user.  The sales representative replied by e-mail dated August 15, 2003:

> SUDARSHAN,
>
> You have requested pricing for VSSC (Vikram Sarabhai Space Center) and they are listed on the [Department of Commerce] Entity list.  Before an order can be place [sic] we will need US Department of Commerce approval prior to commitment.  I cannot accept an order for product that is being shipped to them without a valid export license and for this reason I will not quote.

Later the same day, the sales representative sent an e-mail to SUNDAR in which he advised SUNDAR:

I have yet to see the U.S. government release a license for any company listed on the entity list. This is not a license that you apply for it is one that I must receive before we can accept an order for VSSC. It takes months to get one of the licenses, and I repeat I cannot officially accept the order until I have the license.

26.    In response to sales representative's e-mail concerning the need for Department of Commerce approval, SUDARSHAN informed him as follows:

We will also inform and impose the same condition to our customers. If the license is not approved, neither you nor cirrus will have any bearing on the order. This condition is also imposed as the part of the quote.

Mostly customers like VSSC are fully aware of the licensing situation.

You may send us your bid and repeat . . . the order from us can be accepted only upon the license. The delivery from your end start only from the license.

Cirrus never followed through with the order.

27.    Despite the warnings from the vendor's sales representative about VSSC in his August 15, 2003, e-mails, three days later, on August 18, 2003, SUNDAR faxed the Phoenix vendor a purchase order for an additional 10 WS512K32N-17H1QA SRAMs. Once again, SUNDAR included an end-user statement that purported to be from NPOL and that claimed that NPOL would use the SRAMs "for the development of electronic hardware for oceanographic instrument measuring the ocean parameters for our own use." The vendor shipped the SRAMs to Cirrus Singapore on September 27, 2003. As with the previous shipment, Cirrus' records show that the true recipient of the SRAMs was VSSC. And, again, there was no license for this export.

28.    In May 2004, SUNDAR and GOPAL sent the Phoenix vendor requests for quotation for 30 WS512K32N-17H1IA SRAMs, which is another model of SRAM that the vendor produces. As before, the sales representative asked for an end-user statement. SUNDAR

11

responded in a May 20, 2004, e-mail that:

> The End use is NPOL and the application of use is for the development of electronic
> hardware for oceanographic instrument measuring the ocean parameters of their own use.
> We can get you the End user certificate at the time of the order.
>
> * * *
>
> We hope that we have cleared your doubts and we also understand your concern with
> commerce dept of USA.

29.    In September 22, 2004, SUNDAR faxed the sales representative the end-user

statement, which was identical to the NPOL certificates that Cirrus had provided for the two

previous shipments.

30.    In September 2004, SUNDAR also sent the Phoenix vendor an order for some

additional WS512K32N-17H1QA SRAMs.  On this occasion, SUNDAR disclosed that the

products were for VSSC.  SUNDAR's disclosure of VSSC as the end-user coincided with the

fact that the Department of Commerce had recently proposed easing the sanctions as to VSSC,

and a change in the regulations was imminent.  Notwithstanding any possible change in the rules,

the sales representative, in an e-mail dated September 20, 2004, advised SUNDAR that:

> I have reviewed the End Use statement with management and it has come to our attention
> that Vikram Sarabhai Space Centre (VSSC) is on the Bureau of Industry and Security's
> (BIS) Entity List.  This means I cannot accept this order without a valid export license.  A
> valid export license from BIS must [sic] in place before I can accept this order.

31.    SUNDAR replied to the sales representative with an e-mail dated September 28,

2004, in which he stated, "We are now sending you the relaxation of the export ruling of the US

Gov't for your reference . . .  Hence may we request you to process the order and send us your

confirmation and order acknowledgment."  SUNDAR also attached to the e-mail a pdf version of

the September 22, 2004, Federal Register notice announcing the change in the sanctions as to

VSSC. However, the language of the revised regulation made it clear that any easing of

restrictions for VSSC did not apply to the type of commodity that Cirrus was acquiring from the

Phoenix vendor.

32.     The sales representative for the Phoenix vendor noticed that the SRAMs that

Cirrus was seeking to acquire on behalf of VSSC were identical to those that Cirrus had

previously represented, through end-user statements, were going to NPOL. The sales

representative thus contacted a company representative in India and requested her to inquire

about the end-user certificates with NPOL. The representative soon reported back that she had

spoken with both Mr. Sreeprakash, who purportedly had signed the certificates, and with another

official at NPOL. They advised her that the end-user certificates that Cirrus had supplied the

Phoenix vendor were forgeries and that NPOL had never purchased SRAMs from Cirrus.

33.     On September 29, 2004, the sales representative for the Phoenix vendor sent an e-

mail to SUNDAR. He first informed SUNDAR that the change in the regulations as to VSSC

did not affect the requirement that a license was necessary for the export of the company's

SRAMs to VSSC.

> [We] cannot sell you product to VSSC without the proper licensing, the change [in the
> regulations] that has been does not apply to [our] product. I cannot accept an order from
> VSSC at this time.

The representative then told SUNDAR what he had learned from NPOL:

> I recently received PO CIR/1930 from your office with an end use statement from Naval
> Physical & Oceanographic Laboratory (NPOL). I asked my representative in India to
> contact NPOL to verify that this is a valid end use statement. They contacted T
> Sreeprakash, which is the name listed on the end use statement provided. Mr.

13

Sreeprakash was very upset with the misuse of the end use certificate which may have been provided earlier for some other product/component.  Again Mr. Sreeprakash has confirmed that he has not issued any end use certificate to Cirrus Electronics.

[We have] come to the conclusion that we no longer want to do business with Cirrus Electronics.  I feel it is my duty to report Cirrus Electronics to the Bureau of Industry and Security department (U.S. Dept. of Commerce).

34.      SUDARSHAN responded to the sales representative's September 29, 2004, e-mail to SUNDAR the next day, September 30, 2004, stating:

I take moral responsibility, without shrinking and without passing on to any of my past or present members.  May I seek with you to grant us 15 days time to find out the fact on this case and revert to you.

35.      Although SUDARSHAN claimed to the sales representative for the vendor that he wanted to ferret out any wrongdoing, the instructions he gave in an e-mail that same day to the others at Cirrus were much different:

1) On reading the emails from [the sales representative], do not get panic.  At the end of the game, it is I . . . who need to face the music;

MG: You are not the owner of Cirrus LLC; Members will not be affected . . .  Besides, I am moving over to USA to take control on such crisis. .  Hence, do not fear about anything. .  It is all business Games and come what may be the results,,, Detach ourselves from the results..  We concentrate on actions only.

2) TO AKN:

New Head ache for New CEO . . . .  Do not worry, if we apply our thoughts in professional way..

The actions are as follows:

a) Please call [a Cirrus employee in India]; You and [the employee] may go to VSSC and explain them that our intention is not to make profit on this order but to service VSSC. .

b) Ascertain if VSSC has got some clout over NPOL....  We need not indulge full details to them..

14

* * *

d) We meet NPOL also and explain them so that we do not dent our business with them also....

* * *

It is veil threat of [the Phoenix vendor to go to the Department of Commerce]; There are 1000 such companies and 100,000 complaints..

As mentioned to you earlier, [the Department of Commerce] came to Simal [another Singapore company] to many other distributors in Singapore and just cautioned them only.  In our case, it is not that..

36.    On January 10, 2005, SUDARSHAN sent another e-mail to the Phoenix vendor's sales representative in which he admitted that the NPOL end-user certificates were false and blamed the incidents on overeager employees in India who, in the future, would be better supervised.  SUDARSHAN also proposed going forward with the SRAM orders with accurate end-user certificates from VSSC.  Neither the sales representative nor anyone else at the vendor responded to SUDARSHAN's e-mail, and the Phoenix vendor had no further dealings with Cirrus.

37.    Cirrus still had an outstanding order for SRAMs with VSSC.  In January 2005, PRASAD and another Cirrus India employee visited VSSC and made a proposal to substitute SRAMs manufactured by another company for the Phoenix vendor's SRAMs.  The two companies' products were equivalent.  On February 1, 2005, the Cirrus India employee sent an e-mail to SUDARSHAN and PRASAD, informing them, "Good news. [ubstitute] part offered to VSSC are [sic] acceptable."  This email was found on the account cirruselectronics@gmail.com. On April 5, 2005, VSSC formally amended its purchase order with Cirrus to permit Cirrus to

supply the substitute parts in place of the Phoenix vendors SRAMs.  In November 2005, VSSC

gave Cirrus purchase orders to obtain 240 additional SRAMS.

38.     Cirrus was able to acquire the substitute SRAMS from a vendor in Elmsford, New

York.  Cirrus had the vendor ship the items to Cirrus U.S.A. in South Carolina.  From there,

GOPAL sent them to Cirrus Singapore, which in turn transshipped the SRAMs to VSSC in India.

The exports occurred on March 24, 2006, and on April 17, 2006.  Shipping records show that

both shipments were sent from 201 Huddersfield Drive, Simpsonville, South Carolina, and that

Cirrus U.S.A. paid for both shipments, using 22 Redglobe Court, Simpsonville, South Carolina,

as its company address.  Cirrus did not obtain an export license for either of the shipments.

### 2.     Additional Evidence of Knowledge of the Export Restrictions on VSSC and BDL

39.     Cirrus' interactions with a company in Redmond, Washington, provide additional

evidence that the co-conspirators knew about the restrictions on VSSC and that restrictions on

exports to VSSC remained in place even after the Department of Commerce eased the sanctions

on that entity.

40.     Beginning in 2002, Cirrus began purchasing AC/DC converters and electronic

filters from the Redmond vendor.  The Department of Commerce classified these items as EAR

99.  Cirrus had the company ship the products it purchased to Singapore.  There was nothing that

indicated to the vendor that any of its exports to Cirrus Singapore required a license.

41.     At the end of August 2004, approximately a month before the Department of

Commerce eased the sanctions as to VSSC, Cirrus placed an order for some filters and

convertors with the Redmond company, and SUDARSHAN provided an end-user statement that

disclosed that VSSC was the customer for the products.  This was the first time that Cirrus indicated to the vendor that VSSC was a customer. The end-user statement also stated that the goods were to be used "[f]or instrumentation and telemetry systems of the Indian National Satellite programme for telecommunication, weather forecasting, disaster warning, etc."  Despite the imminent relaxation of the regulations to permit exports of EAR 99 commodities to VSSC, the vendor insisted on filing for an export license with the Department of Commerce.  On December 7, 2004, the Department of Commerce denied the application because of the end-use of the goods.  The Redmond vendor notified Cirrus of the denial.

42.    Cirrus continued to place orders with a Redmond, Washington, vendor on behalf of VSSC.  On receipt of these orders, the vendor filed license applications with the Department of Commerce.  When SUDARSHAN, in December 2005, expressed annoyance about the delays the licensing process created, a sales manager for the vendor responded to him as follows:

> [Cirrus' orders] will also require export licenses based on the information we received from you as to the application and end customer.  Per Export Administration Regulations, part 744.3:
> "Restrictions on certain rocket systems (including ballistic missile systems and space launch vehicles and sounding rockets) and unmanned air vehicles (including cruise missile systems, target drones and reconnaissance drones) end-uses."
> I hope that this explains further the need for DOC licenses.

The Department of Commerce again denied the new license applications because of the end-use of the products.  This message was sent via email to cirruselectronics@gmail.com on December 20, 2005.

43.    In September 2006, Cirrus had other orders pending with the Redmond vendor. On September 19, 2006, GOPAL telephoned the company's sales manager.  GOPAL told the

sales manager that she had spoken with an official at the Department of Commerce and that the

official had informed her that, because the Department of Commerce classified the vendor's

products as EAR 99, they did not need an export license.  When the sales manager asked whether

GOPAL had told the Commerce official that the goods would be going to VSSC in India and that

VSSC would be using the parts in a satellite launch vehicle, GOPAL responded, "Of course."

The sales manager then called the official herself.  The official told the sales manager that she

never had spoken with GOPAL and that, even if she had, she would never provide a caller with a

licensing determination.  FBI agents also have interviewed the Department of Commerce

Official.  She reiterated to them what she had told the vendor's sales representative.

        44.     On September 16, 2005, SUDARSHAN, at the request of a vendor in Hauppage,

New York, signed a "Statement of Assurance," which provided:

> We acknowledge that products (or technical data) to be purchased from [the vendor]
> include or may include products which are subject to export control laws and regulations
> of the United States.

> We hereby certify that all sale, transfer, consignment, loan or donation of products and/or
> technology acquired from [the vendor], made directly or indirectly outside the United
> States are made in full compliance with all applicable export control laws and regulations.

The "Statement of Assurance" was sent to the vendor in  Hauppage, New York by email, and it

was also sent to cirruselectronics@gmail.com.  Shortly after SUDARSHAN signed the

"Statement of Assurance," on September 30, 2005, Cirrus exported some components –

capacitors – that it had purchased from the vendor to BDL.  Capacitors store and discharge

electrical current and have applications in missile guidance and firing systems.  The investigation

has revealed that, on the following dates, Cirrus made additional exports to BDL of electrical

components with similar applications: November 4, 2005; January 14, 2006; and April 7, 2006.

For all of the exports to BDL, the products were first shipped to Cirrus U.S.A., in Simpsonville,

South Carolina. GOPAL then forwarded the goods to Cirrus Singapore, which then re-exported

them to BDL. Cirrus did not obtain licenses from the Department of Commerce for these exports

to BDL.

      45.    On July 14 and 15, 2005, Cirrus Singapore's Marketing Manager attended a

seminar in Bangalore, India, that the Department of Commerce presented under the title

"Strategic Trade Controls." The course covered the entire range of export restrictions, including

those found both in the EAR and in the ITAR. Course participants received a large three-ring

binder of materials. Details of the seminar were forwarded via email to AKN PRASAD and

cirruselectronics@gmail.com on July 4, 2005, by a representative organizing the conference. On

May 9, 2006, agents searched SUDARSHAN's belongings when he re-entered the country at

Detroit Metropolitan Airport. In one of SUDARSHAN's bags, agents found the three-ring binder

from the Strategic Trade Controls course. There was a section of the notebook devoted to the

Entity List. In addition, a pocket of the notebook contained notes that the marketing manager

appeared to have taken during the course. The notes included references to specific State

Department controls.

      46.    On February 10, 2006, SUDARSHAN had a conversation with a representative of

Bharat Electronics, Ltd. ("BEL"). SUDARSHAN was trying to solicit business from BEL,

which previously had been on the Entity List. During the conversation, SUDARSHAN observed

to the BEL official that, during the period when BEL was subject to sanctions, Cirrus supported

BEL "very heavily" and that the "orders were flowing like water."  On February 15, 2006, a letter

signed by SUDARSHAN and addressed to the BEL representative was sent to AKN PRASDAD

and to cirruselectroincs@gmail.com.  The letter stated:

> May we take this opportunity to introduce ourselves as one of the leading distributors of Electronic and Electro-mechanical components and supplying MIL- Grade, Space Qualified components to Indian Defence, Space and Aerospace sectors?
>
> Cirrus Electronics is one of the approved vendors to the below organizations:-
>
> | | |
> |---|---|
> | Bharat Electronics Ltd., Bangalore | Vendor Code  C01488 |
> | Aeronautical Development Establishment (ADE) | Vendor Code  833 |
> | Bharat Dynamics Limited | Vendor Code  C 5039 |
>
> For your quick reference, we are pleased to enclose here with some of the orders which we have executed with Indian customers.
>
> In view of the above, we request you to please register our company name in your existing vender list and kindly arrange to send us all of your future enquiries to us in order to submit our competitive     prices.
>
> Thanking you,
> With Our Best Regards,
> P. Sudarshan

47.    In a conversation on March 9, 2006, between SUNDAR and GOPAL, SUNDAR

reminded GOPAL that she must send all items to Singapore first, rather than directly to India, or else

"there would be problems in the Customs clearance."

### C.    Evidence of Willful Violations of AECA and the ITAR

### 1.    Evidence of Knowledge of AECA's and the ITAR's Restrictions on the Export of Defense Articles

48.    Cirrus' dealings with a company in Fountain Valley, California, provide good proof

not only of its members' knowledge that electrical components for military aircraft were subject to

the ITAR, but also of their intent to evade the ITAR's controls.  In addition, this particular vendor

put Cirrus on notice that the State Department considers India a sensitive country and that exports

of defense articles to India receive special scrutiny during the licensing process.

49.     In September 2003, Cirrus placed an order for 200 night vision filters with the

Fountain Valley vendor.  Night vision filters block out the light rays that interfere with night vision

goggles.  Use of the filters permits  a pilot wearing night vision goggles to see the control panel and

operate a plane at night.  As of the time of this order, Cirrus had yet to open its South Carolina office,

so the items were to be shipped to Singapore.  The vendor, through its operations manager,

responded to Cirrus' order by informing SUDARSHAN that the company needed to get a license

from the State Department before it could export the parts and that Cirrus had to supply an end-user

statement.

50.     A short time after Cirrus placed its order for the night vision filters, GOPAL opened

the South Carolina office.  Cirrus then approached a company in Hudson, Florida, and had the

company place the identical order for filters with the Fountain Valley vendor.  However, on its

purchase order form to the vendor, the Florida company crossed out its address and wrote in Cirrus'

name and address.  It also added a notation that Cirrus' FedEx account was to be billed for the

shipping.  The vendor refused to fill the order from the Florida company and informed Cirrus that

it would make no sale of the filters until the State Department had approved the license.

51.     SUDARSHAN, both in e-mail messages and in phone calls, complained to the

vendor's operations manager about how the delay was interfering with production at Cirrus'

customer.  He suggested that the vendor send 50 to 100 parts immediately and then provide the

remaining portion of the order after the license was approved. The operations manager refused to make any export in the absence of a license.

52.     The license application process took several months. Both SUDARSHAN and GOPAL continued to complain to the Fountain Valley vendor. On April 8, 2004, a company representative sent SUDARSHAN and GOPAL the following e-mail:

> I apologize but I did not receive your message earlier in the week; however, I did receive a call from the State Department Licensing Agent this afternoon. Due to the fact that the end user is in India, which is considered a sensitive country to conduct business with, our application will now have to go through an extensive approval process called "staffing". In the past, this has added many weeks to the acceptance timeframe. I know this is not the type of response your were hoping for, but our hands are tied. We cannot move forward without authorization from the US Dept. of State. I will let you know if I am informed of any progress.

53.     On May 13, 2004, the State Department approved the license for the export of the night vision filters. SUDARSHAN sent an e-mail to the company representative thanking her for her efforts, but again complaining about the delay. The representative responded:

> First of all I would like to point out that this EXTREMELY LONG application approval was due to the end user location of India. Common turnaround for non-sensitive country shipments are [sic] about 30 days.

The export of the night vision filters to Cirrus is the only export in which Cirrus was involved for which there is a license on file with either the Department of Commerce or the State Department.

54.     On February 10, 2006, SUDARSHAN spoke with a sales representative at a vendor in Hauppage, New York, concerning a part that Cirrus was trying to acquire for ADE. When the sales representative asked where the product was going, SUDARSHAN said that it would go to Cirrus' office in Singapore and then probably to India. At that point, the sales representative told SUDARSHAN that the part was a military item and highly restricted and that it would be a federal

offense for SUDARSHAN to export it from the United States.  SUDARSHAN proposed that Cirrus U.S.A. could get a license to export it, but the sales representative declined to rely on SUDARSHAN's assurances that he would get a license.   The sales representative told SUDARSHAN that there would be "no exportation of this product."  He also said to SUDARSHAN, "I am not going to go to jail for this . . .  And I don't think you want to go to jail for that either."

**2.      The Exports of the i960 Microprocessors to ADE**

55.     In December 2002, Cirrus received a request for a price quotation from ADE for 500 Intel i960 microprocessors for use in the Tejas Light Combat Aircraft.  In April 2003, ADE agreed to purchase the microprocessors from Cirrus for approximately $500,000.  The application of the i960 microprocessor in the Tejas was in the plane's navigation and weapons guidance systems. When used in this manner, the i960 is classified as a defense article on the ITAR's Munitions List, and any export of the i960, which acts as an onboard computer, requires a license from the State Department.

56.     SUDARSHAN was aware of the application of the i960 in the Tejas aircraft.  On October 19, 2005, defendant PRASAD, Cirrus India's CEO, sent an e-mail to SUDARSHAN and cirruselectronics@gmail.com  in which he discussed an opportunity to supply microprocessors for another Government of India fighter jet program.  PRASAD wrote:

> [A Cirrus associate] received a good enquiry to develop WCS (Weapon control System) for Jaguar Aircraft.
>
> The WCS consists of a micro controller/micro processor based on logic system with relays to ensure outputs are generated to release various stores (armaments) based on inputs coming from NAVWASS [Navigation and Weapon-Aiming Sub System] and pilot settings.
>
> To start with we need to identify a Microcontroller/microprocessor cleared for Military

Airborne use, like the Intel i960.  i960 may be an overkill for this project.

57.    A vendor in Newburyport, Massachusetts, produced and tested the i960 under license from Intel.  ADE instructed Cirrus to obtain the microprocessors from that vendor and to have the vendor perform a variety of ruggedness tests on the items.  In carrying out the contract, Cirrus was directed to, and did, coordinate closely with officials at ADE and with a government of India official in the United States.  The coordination included SUDARSHAN's accompanying the Indian government official and a high-level officer with ADE, on two separate trips to the vendor to observe the testing of the i960 microprocessors.  In February 2004, Cirrus had the Newburyport vendor ship 377 i960 microprocessors to Singapore.  Upon arrival of the goods in Singapore, Cirrus Singapore re-exported them to ADE in India.  There was no license from the State Department for this export. The remaining 123 i960 microprocessors were exported to ADE in similar fashion in October 2005.

58.    In February 2004, when SUDARSHAN visited the vendor for the first round of tests of the i960 microprocessors, the company's sales representatives wanted to know from SUDARSHAN what Cirrus Singapore would do with the parts once they arrived in Singapore. SUDARSHAN assured them that the microprocessors would remain in Singapore.  He claimed that they were for a joint project that the Government of India was doing with Lockheed Martin in Singapore.  That representation was false.  The FBI has spoken with representatives from Lockheed Martin.  The company has no such joint project with India in Singapore. Moreover, documents and communications obtained from cirrueselectronics@gmail.com  during the investigation show that the microprocessors went to ADE in India.

59.    With respect to the October 2005 export of i960 microprocessors, the vendor placed

the responsibility for complying with any licensing requirements on Cirrus. Cirrus made no effort to get a license for the export and made no inquiries about the need for a license with either the Department of Commerce or the State Department.

> **D.    Evidence of Acting as Illegal Agents of a Foreign Government**

60.    As described above, in arranging for the testing, purchase, and export of the i960 microprocessors, both SUDARSHAN and GOPAL were in frequent contact with an Indian government official in the United States concerning the details and the coordination of the transactions. They had similar contacts with the ADE official with respect to his visit to the United States to observe the second set of tests. Many of these contacts occurred via email to and from cirruselectronics@gmail.com.

61.    VSSC and ADE are parts of the Indian government. In procuring electrical components for these entities, the Cirrus members were acting at the direction of representatives of the Indian government. Communications with these individuals were facilitated utilizing the email account cirruselectronics@gmail.com.

62.    On February 10, 2006, SUDARSHAN indicated to a potential customer in Garden City, New York, that Cirrus U.S.A. was opened to cater to an Indian government official in Washington DC.

63.    The Counterespionage Section of the Department of Justice maintains a list of all agents of a foreign government who have provided the required notice to the Attorney General. A check of the list revealed that neither SUDARSHAN nor GOPAL had provided such notification at any time.

**E.    Additional Facts Supporting Probable Cause that Evidence of the Criminal Violations Is Located On cirruselectronics@gmail.com**

64.    On October 15, 2003, SUDARSHAN indicated to a U.S. vendor based in Newburyport, Massachusetts, that Cirrus maintains its sales records for seven (7) years, which include export invoices and Air Way bill numbers.  Air Way bills from a freight forwarder in Singapore known as DAN AIRFREIGHT ("DAN AIR") have been found on cirruselectroincs@gmail.com.  DAN AIR was used by Cirrus to sent components received at their Singapore office to end-users in India.    For instance, on November 10, 2005, cirruselectronics@gmail.com contained an Air Bill from DAN AIR for a shipment of U.S. origin electronic capacitors.  This Air Bill reflected a shipment from Cirrus in Singapore to BDL in India.

65.    On May, 31, 2005, SUDARSHAN indicated in an e-mail to a Foreign Official of the Government of India located in the District of Columbia, using cirruselectronics@gmail.com, that he came to the United States to live in order "to give more strength to Cirrus Operations." SUDARSHAN indicated to the  Foreign Official of the Government of India that "it is our pleasure to be of service to your Organization".

66.    On February 2, 2006, in a filing with the Department of Homeland Security in support of an application to extend his work visa, SUDARSHAN outlined how the computer network for Cirrus Electronics global operation is managed and distributed.  SUDARSHAN indicated that a back-up of all Cirrus Electronics business files are maintained at Cirrus U.S.A.  SUDARSHAN indicated that these files can be accessed through GOPAL's desktop computer and SUDARSHAN's laptop computer.  SUDARSHAN indicated that GOPAL's desktop computer and his laptop computer were connected through a LAN (Local Area Network).  SUDARSHAN indicated the Cirrus U.S.A.

27

functioned as a "Warehouse" for goods received from U.S. vendors and vendors.

67.    On March 23 2007, a physical search of Cirrus U.S.A at 201 Huddersfield Drive, Simpsonville, South Carolina, and at 22 Redglobe Court, Simpsonville, South Carolina resulted in the capture of numerous business records and digital storage devices that indicated Cirrus currently relies on email to conduct business and as such, is utilizing the account cirruselectronics@gmail.com.

## TECHNICAL BACKGROUND REGARDING COMPUTERS, THE INTERNET, E-MAIL, GOOGLE AND SEARCH PROTOCOL

68.    The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet. The world wide web ("www") is a functionality of the Internet which allows users of the Internet to share information;

69.    With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods.

70.    E-mail is a popular form of transmitting messages and/or files in an electronic environment between computer users. When an individual computer user sends e-mail, it is initiated at the user's computer, transmitted to the subscriber's mail server, then transmitted to its final

destination.  A server is a computer that is attached to a dedicated network and serves many users.
An e-mail server may allow users to post and read messages and to communicate via electronic
means.

71.    The following provides a general description of what Google is and how it operates:

a.      Google is an Internet services company that, among other things, provides e-mail
services (known as gmail) that are available to subscribers for free (or for a monthly fee depending
on the level of service provided).  Subscribers obtain an account by registering on the Internet with
Google.  Google requests subscribers provide basic information, such as name, gender, zip code and
other personal and biographical information.  Google does not generally verify the information
provided by subscribers;

b.      Subscribers to Google may access their Google accounts using the Internet;

c.      Any e-mail that is sent to a Google subscriber is stored in the subscriber's "mail box"
on a server hard drive under the control of Google.  If the message is not deleted by the subscriber,
that message can remain on the Google server hard drive indefinitely;

d.      When a Google subscriber sends an e-mail, it is initiated on the Google server and
then transmitted to its end destination through the Internet.  The Google subscriber who sent the e-
mail has the option of saving a copy of the e-mail sent.  Depending on the election of the subscriber,
the e-mail can remain on the system indefinitely;

e.      A Google subscriber can store files, including e-mails, text files, and image files, in
the subscriber's account on the Google servers; and

f.      E-mails and other files stored by a Google subscriber  in a Google Account are not

necessarily also located on the computer used by the subscriber to access the Google account.  The subscriber may store e-mails and other files in their Google account server exclusively.  A search of the files in the subscriber's computer will not necessarily uncover the files that the subscriber has stored on the Google server. In addition communications sent to the Google subscriber by another, but not yet retrieved by the subscriber, will be located on the Google server in the subscriber's account, but not on the computer used by the subscriber.

72.    With regard to respect to venue, one of the elements of the export offenses is the failure to obtain licenses from either the Department of Commerce or the Department of State, both of which are in the District of Columbia.  Accordingly, the failure to obtain the licenses occurs in the District of Columbia, where the licensing agencies are.  In addition, as noted above, the co-conspirators here coordinated some of the unlawful exports with a Government of India official posted with the Indian Embassy in the District of Columbia.  In doing so, they sent e-mails to this individual in the District of Columbia.

74.    Although Google is located in California, I am submitting this affidavit in the District of Columbia pursuant to Title 18, United States Code, Section 2703(c)(1)(A), which authorizes any court with jurisdiction over an offense to issue a search warrant for the records of an electronics communication service provider.

**CONCLUSION**

75.    Therefore, on the facts and for the reasons set forth above, I respectfully request that a search warrant be issued authorizing law enforcement personnel to search the email account: cirruselectronics@gmail.com.  The materials the government seeks to seize constitute evidence, and

are the fruits and instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy); 50 U.S.C. § 1705

(International Emergency Economic Powers Act - "IEEPA"); 15 C.F.R Parts 730-774 (Export

Administration Regulations - "EAR"); 22 U.S.C. § 2778 (Arms Export Control Act - "AECA"); 22

C.F.R. §§ 120-130 (International Traffic in Arms Regulations - "ITAR"); and 18 U.S.C. § 951(a)

(Illegal Agent of a Foreign Government), namely, documents and other items pertaining to the

purchase, shipment, and export of commodities from the United States to Singapore and India, as

set forth more fully in Attachment A.

James D. Walker
Special Agent,
Federal Bureau of Investigation

_____

_____

Subscribed and sworn to before me this _____ day of _____, 2007.

Hon. United States Magistrate Judge

_____

**ATTACHMENT A**

**I.  Service of Warrant and Copying of Computer Files by Google.**

> A.    The officer or agent executing this warrant shall effect service by any lawful method including faxing the warrant (with Google's consent) to the Google office at the location specified in the warrant.

> B.    The officer or agent executing this warrant shall permit Google, as custodian of the computer files described in Section II below, to locate the files, copy them onto removable electronic storage media or print them out as paper copies (or use a different copying method if specified in Section II below), and deliver the copies to the officer or agent, who need not be present during this process at the location specified in the warrant.

> C.    Pursuant to 18 U.S.C. § 2703(b)(1)(A), Google and its agents are hereby prohibited from notifying the subscriber(s) of the above-listed Google accounts, or anyone else, of the search warrant.

> D.    The U.S. Department of Justice and the Federal Bureau of Investigation shall not be prohibited from sharing information obtained from this warrant with other law enforcement and intelligence agencies, including foreign law enforcement and intelligence agencies, for use in investigation and prosecution.

## II.  Files and Accounts to be Copied and Delivered by Google

All records or other stored information relating to the account associated with email address cirruselectronics@gmail.com, which are evidence, fruits and/or instrumentalities of past and continuing violations of: 18 U.S.C. § 371 (Conspiracy); 50 U.S.C. § 1705 (International Emergency Economic Powers Act - "IEEPA"); 15 C.F.R. Parts 730-774 (Export Administration Regulations - "EAR"); 22 U.S.C. § 2778 (Arms Export Control Act - "AECA"); 22 C.F.R. Parts 120-130 (International Traffic in Arms Regulations - "ITAR"); and 18 U.S.C. § 951(a) (Illegal Agent of a Foreign Government) - to wit, all such files referring or relating to exports from Cirrus U.S.A. to Cirrus Singapore and India and exports by Cirrus of any restricted commodities and defense articles, and any other items as follows:

A.    all e-mails and their contents, including any attachments, sent by or received by the account, whether saved or deleted, whether contained directly in the e-mail account or in a customized "folder";

B.    a complete log file of all activity relating to the account (including dates, times, method of connection, port, dial-up, registration IP address, and/or location);

C.    all detailed billings records (log on & log off times);

D.    all records of subscriber information and account preferences maintained by, or related to, the account (including but not limited to subscriber name(s), addresses, home and business telephone numbers, screen names, account numbers, status of account, duration of account, dates of services, and method of payment);

E.    all email addresses, names, and telephone numbers and other information listed in

the account's buddy list and address book, as well as aliases;

F.      method of payment;

G.      histories and profiles;

H       Any and all Google address books and/or Google Instant Messenger list maintained by the accounts;

I.      Internet Protocol (IP) addresses used to create and access Google accounts or screen names;

J.      All text messages pertaining to the illegal export of weapons, munitions, or other prohibited goods from the United States or the transfer of money.

K.      Archived chat communications pertaining to the illegal export of weapons, munitions, or other prohibited goods from the United States or the transfer of money, whether sent or received by the accounts, whether saved or deleted, and whether proprietary or not;

L.      Account preferences;

Copies of the above-described records and stored information should be obtained from original storage and provided on CD-R (CD-Recordable) or media.